Hart v. First Oak Wealth Mgmt., LLC, 2022 NCBC 41.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

STEVEN C. HART,

Plaintiff,

v.

FIRST OAK WEALTH
MANAGEMENT, LLC; DWM
ADVISORS, LLC; AIRIS ALEXANDER
ABOLINS; and JOSEPH P. DAVIS, III,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 15763

**ORDER AND OPINION ON MOTIONS
TO DISMISS**

1.     The dispute in the above-captioned matter involves an alleged securities fraud scheme.  It is before the Court on Defendant Airis Alexander Abolins' Motion to Dismiss (the "Abolins Motion"), (ECF No. 9), and Defendant First Oak Wealth Management, LLC's Motion to Dismiss (the "First Oak Motion"; together with the Abolins Motion, the "Motions"), (ECF No. 14), pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)").

2.     Having considered the Motions, the related briefing, the arguments of counsel at a hearing on the Motions and other relevant matters of record, the Court **GRANTS in part** and **DENIES in part** the Motions as provided below.

*Mauney PLLC, by Gary V. Mauney for Plaintiff Steven C. Hart.*

*Bell, Davis & Pitt, P.A., by Joshua B. Durham and Kevin J. Roak for Defendant Airis Alexander Abolins.*

*Vann Attorneys, PLLC by James R. Vann and Ian S. Richardson for Defendant First Oak Wealth Management, LLC.*

*Defendants DWM Advisors, LLC and Joseph P. Davis, III have not appeared.*

## I.    FACTUAL AND PROCEDURAL BACKGROUND

3.    The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6).  Rather, the Court tests the claims by stating the relevant factual allegations in the Complaint construed in the plaintiff's favor without being bound to any of its alleged legal conclusions.  *See, e.g.*, *Concrete Serv. Corp. v. Invs. Grp., Inc.,* 79 N.C. App. 678, 681 (1986).

4.    Plaintiff Steven C. Hart ("Plaintiff"), a citizen and resident of Mecklenburg County, North Carolina, is a hydrogeologist.  He employed Defendants to help him invest personal funds.  (Compl. ¶ 3, ECF No. 3.)

5.    Defendant First Oak Wealth Management, LLC ("First Oak") is a closely-held North Carolina limited liability company that maintains its principal place of business in Wake County, North Carolina.  (Compl. ¶ 4.)

6.    Defendant DWM Advisors, LLC ("DWM") is also a closely-held North Carolina limited liability company that maintained its principal place of business in Durham County, North Carolina.  (Compl. ¶ 5.)

7.    Defendant Joseph P. Davis, III ("Davis") is a citizen and resident of Orange County, North Carolina.  Davis was the Managing Member and Chairman of DWM.  (Compl. ¶ 6.)

8.    Defendant Airis Alexander Abolins ("Abolins"), a citizen and resident of Wake County, North Carolina, is a Managing Member of First Oak. (Compl. ¶ 7.) Prior to the formation of First Oak, Abolins also held himself out to Plaintiff as

DWM's Director, Chief Investment Officer, and Senior Vice President for Research and Analytics. (Compl. ¶ 7.) At all relevant times, Abolins was a "registered investment adviser" with state and federal regulatory authorities. (Compl. ¶ 18.)

9. During 2009, Plaintiff began looking for an investment adviser to help him develop a savings and retirement plan. (Compl. ¶ 65.) That June, Plaintiff met Davis, who purported to be an experienced registered investment adviser. Davis presented Plaintiff with brochures and information about DWM, himself, and "other professionals at DWM Advisors (*i.e.*, Abolins)[.]" (Compl. ¶ 66.)

10. Plaintiff and Davis "discussed various investment options and approaches." (Compl. ¶ 66.) Based on these discussions and on "verbal and written information about Davis' qualifications, credentials, and Davis' apparent suitability to provide investment advisory and financial management services[,]" Plaintiff "reached a level of comfort and trust" with Davis. (Compl. ¶ 67.) On 25 June 2009, Plaintiff agreed to execute Davis' proposed Investment Advisory Agreement (the "DWM Agreement"). (Compl. ¶¶ 68–69.)

11. The DWM Agreement confirmed that DWM was registered as an investment adviser and stated that DWM was a fiduciary with respect to Plaintiff's account. The DWM Agreement also provided for DWM to have "full power to direct, manage, and change the investment and reinvestment of the assets in the account . . . without prior consultation with or notice to [Plaintiff][.]" (Compl. ¶¶ 69(A)–(C).)

12. DWM set investment targets for Plaintiff based on Plaintiff's primary investment goals, which were "moderate risk" and "capital preservation." (Compl. ¶¶ 84–85.) As a result of these goals, the investments made on behalf of Plaintiff "were supposed to primarily consist of traditional forms of publicly-traded stocks and short and intermediate term bonds." (Compl. ¶ 86.)

13. From time to time after Plaintiff engaged DWM in 2009, DWM provided Plaintiff with a Form ADV, a disclosure brochure that the Securities and Exchange Commission ("SEC") requires investment adviser firms to provide to clients. DWM also sent Plaintiff its own supplemental brochure to provide additional information about its qualifications and business practices. (Compl. ¶ 71.)

14. The fee for Defendants' services was calculated as a percentage of the Plaintiff's "assets under management." (Compl. ¶ 19.)

<u>DWM's Representations to Plaintiff</u>

15. On 27 April 2011, DWM, "through Abolins and Davis," sent Plaintiff a supplemental brochure that contained the following representations:

a. Mr. Davis is not engaged in any other business activities.

b. Mr. Davis has no other income or compensation to disclose.

c. As the primary owner of DWM, Joseph Davis supervises all duties and activities of the firm, and is responsible for all advice to clients.

(Compl. ¶ 72.)

16. In addition, on 27 April 2011, DWM Advisors issued its Form ADV, "drafted by Abolins and Davis[,]" containing the following representations:

a. DWM has no disciplinary events to report;

b. DWM has adopted a Code of Ethics which requires DWM associated persons to act with honesty, good faith and fair dealing in working with clients. In addition, the Code prohibits associated persons from trading or otherwise acting on insider information;

c. Under the Code's Professional Standards, DWM expects its associated persons to put the interests of its clients first, ahead of personal interests. In this regard, DWM associated persons are not to take inappropriate advantage of their positions in relation to DWM clients;

d. DWM's Code sets forth policies and procedures to monitor and review the personal trading activities of associated persons. DWM has adopted procedures designed to reduce or eliminate conflicts of interest this could possibly cause;

e. DWM's policies are designed to discourage and prohibit personal trading that would disadvantage clients; and

f. Joseph P. Davis, DWM's Managing Director, and Abolins, DWM's SVP for Research and Analytics review client accounts.

(Compl. ¶¶ 73, 75(A)–(F).)

17. DWM's Form ADV stated that Abolins' "primary focus" was "at the client level, ensuring all aspects of DWM's clients' financial lives have been thoroughly reviewed, and making sure 'no stone is left unturned[.]' " (Compl. ¶ 75(H).)

18. Finally, the Form ADV reported that DWM Advisors did not have any "Proprietary Interest in Client Transactions" or "Sales Interest in Client Transactions." (Compl. ¶¶ 75(I)–(J).)

The CarFab Investment

19. On 1 July 2009, DWM Advisors began investing Plaintiff's funds into a private company called Carolina Fabrication, Inc. ("CarFab"). (Compl. ¶ 139.) Over a period of several months, DWM invested $125,000.00 of Plaintiff's funds in exchange for three promissory notes. (Compl. ¶ 140.)

20. Plaintiff alleges that during the time DWM was investing his money in CarFab, Davis and Abolins, the principals at DWM, knew that the company was "in financial distress." (Compl. ¶ 140.) They nevertheless steered the money to CarFab because Davis was one of its owners. Neither Davis nor Abolins disclosed this conflict to Plaintiff. (Compl. ¶ 142.)

21. By September 2012, Davis knew that CarFab would not be able to meet its obligations with respect to Plaintiff's notes. Despite this knowledge, DWM continued to charge Plaintiff fees for the investment. (Compl. ¶¶ 143–44.)

22. Davis told Plaintiff by letter that he was working on getting CarFab to propose a solution with respect to the notes, but this representation was false. (Compl. ¶ 144.)

### The SSE Group Investment

23. In December 2012, Davis told Plaintiff that CarFab's financial problems would be resolved through a settlement agreement between CarFab and its noteholders. The settlement agreement provided for shares of CarFab to be transferred to SSE Group ("SSE"), an entity formed by the noteholders. (Compl. ¶¶ 145–46.)

24. Plaintiff alleges that Davis and Donald Collins ("Collins"), a long-time friend and business partner, were behind the SSE/CarFab restructuring scheme and that the scheme was merely a means to placate DWM's clients by leading them to think that CarFab might still be viable "down the road." (Compl. ¶ 151.)

25.     Davis informed Plaintiff that, with the restructuring, CarFab was still a "potentially viable business." (Compl. ¶ 150.) DWM, "meaning Davis and Abolins," did not reveal that, in fact, the investment was a total loss. (Compl. ¶ 151.)

26.     The restructuring plan transformed Plaintiff's notes in CarFab into unguaranteed equity in SSE. (Compl. ¶ 152.)

27.     Unbeknownst to Plaintiff, Davis was the sole owner of SSE's single Class B Unit. The Class B Unit entitled Davis to the same return as the Class A Units issued to investors. (Compl. ¶ 148.)

28.     On 28 April 2014, Davis told Plaintiff, without further explanation, that Plaintiff was subject to a "legally binding 'capital call' obligation" for CarFab in the amount of $5,257.46. Plaintiff paid the capital call. (Compl. ¶ 155.)

29.     On 1 May 2014, Davis described CarFab to its investors as a company that was "just so close to achieving our goals." He said that "orders are beginning to flow. It's possible, given the cash needs being met and the bank continuing to be flexible, that 8 to 10 million dollars of revenue could be possible this year." (Compl. ¶ 156.) Davis wrote that the company had received so many quotes and orders, they could "hardly keep up with the bids." In reality, however, Davis knew that the company was headed toward insolvency. (Compl. ¶ 156.)

30.     On 5 December 2014, Abolins wrote Plaintiff regarding "a few things for action" with respect to his estate planning. (Compl. ¶ 157.) One of his suggestions

was "retitling the alternatives as well (ADA, IQMAX, Montague, SleepSafe & SSE)." (Compl. ¶ 157.)[1]

31.     CarFab closed its doors and ceased operations on 12 June 2015. (Compl. ¶ 159.)

32.     DWM continued to carry SSE on Plaintiff's account and to charge Plaintiff a fee for it even though DWM, "meaning Davis and Abolins," knew the asset was worthless. (Compl. ¶ 158.)

33.     Davis and Abolins also continued to send DWM's client account statements to Plaintiff, reflecting knowingly false and inflated values for CarFab and SSE. (Compl. ¶ 178.)

34.     In October 2015, the SEC asked whether DWM had given notice to its clients that CarFab and SSE were defunct. Davis falsely represented to the SEC that notice of CarFab's failure had been mailed to DWM clients in June 2015. (Compl. ¶ 176.)

35.     Thereafter, on 9 October 2015, Davis drafted a disclosure letter about CarFab to CarFab's then-president, Michael Warrick, "with instructions to 'cut-and-paste' the letter on CarFab/SSE letterhead, post-dated to June of 2015." (Compl. ¶ 177.) Davis then directed Warrick to send the post-dated letter back to him, "with a note appended indicating that the same letter had been sent to CarFab investors in June." (Compl. ¶ 177.)

---

[1] ADA, IQMAX, Montague and SleepSafe were other entities in which Plaintiff's money had been invested. They are discussed *infra* ¶¶ 37, 50, 56–57, 61.

36.     On 12 December 2015, Davis filed paperwork with the North Carolina Secretary of State officially dissolving SSE.  (Compl. ¶ 159.)

The IQMAX Investment

37.     Another investment made on Plaintiff's behalf early in his relationship with DWM was $50,000.00 in exchange for an unsecured promissory note issued by IQMAX, Inc. ("IQMAX"), a start-up company.  (Compl. ¶¶ 89–91.)   The note was subordinated to other debt and was non-negotiable.  It provided a warrant option to purchase shares of IQMAX.   DWM exercised the option on behalf of Plaintiff.  (Complaint ¶¶ 92–93.)

38.     Plaintiff was unaware that Davis was Chairman of the board at IQMAX.  (Compl. ¶ 114.)  This position gave Davis "inside knowledge" about the company's financial position.  (Compl. ¶ 114.)  By 14 December 2012, Davis also owned 971,772 shares of common stock in IQMAX, approximately 8.46% of the company.  (Compl. ¶ 115.)  Davis' conflicts of interest with IQMAX were never disclosed to Plaintiff.  (Compl. ¶ 114.)

39.     On 29 July 2011, IQMAX defaulted on the note.  (Compl. ¶ 94.)  DWM, "through Davis and Abolins," presented Plaintiff with a Modification Agreement seeking an extension on the note's repayment terms through 23 July 2012 in exchange for a warrant giving Plaintiff the option to buy even more IQMAX stock. However, this stock could only be sold if IQMAX completed an initial public offering. Plaintiff did not receive audited financial statements in order to evaluate IQMAX's

financial condition, and the Modification further subordinated Plaintiff's note. (Compl. ¶¶ 95–98.)

40. Once again, IQMAX did not pay the note when it came due on 23 July 2012. Even though the note was in default, DWM, "operating through" Davis and Abolins, continued to reflect IQMAX at "full value" on Plaintiff's account and to charge Plaintiff fees based on that "full value." (Compl. ¶ 101.)

41. At DWM's direction, Plaintiff then executed a second Modification Agreement, further extending the payment obligations on the note in exchange for a warrant allowing for the purchase of even more IQMAX stock. (Compl. ¶ 103.)

42. DWM continued to increase Plaintiff's investment in IQMAX despite the fact that it was "on the brink of insolvency." (Compl. ¶ 105.)

43. In May 2013, when IQMAX continued to be in default on the note, DWM, "meaning defendants Davis and Abolins," recommended that Plaintiff convert the note into IQMAX equity, making it "virtually certain he would never collect on this investment." (Compl. ¶ 107.) Although IQMAX presented the opportunity to invest more money in IQMAX as arising from a "corporate restructuring," due to "their inside position with IQMAX, . . . Davis and Abolins knew better." (Compl. ¶ 107.)

44. Davis and Abolins did not tell him that IQMAX had already suffered cumulative losses of approximately $32,000,000 as early as 31 December 2011. (Compl. ¶ 108.) Instead, Plaintiff alleges that Davis and Abolins "continued to make representations about the company's promise as an investment." (Compl. ¶ 109; *see* Compl. ¶ 238(a).)

45.     From mid-October 2016 through at least 8 January 2019, DWM, "by and through defendants Davis and Abolins," continued to reassure Plaintiff that his investment in IQMAX was worth $163,876.59, and DWM Advisors continued to charge [P]laintiff fees against this purported 'value'." (Compl. ¶ 111.) In reality, however, IQMAX was "essentially defunct." (Compl. ¶ 112.)

46.     Both Davis and Abolins "repeatedly and continuously" expressed enthusiasm for IQMAX as an investment. (Compl. ¶ 114.) They did not tell Plaintiff that Davis was chairman of the IQMAX board or that by December 2012 Davis owned 8.46% of the company. (Compl. ¶¶ 114–15.)

47.     They also did not tell Plaintiff that another entity formed by Davis, "Exchange Notes, LLC" ("Exchange Notes"), had a "consulting agreement" with IQMAX and that in 2012 alone, IQMAX paid Exchange Notes $114,000.00. (Compl. ¶ 116.)

48.     Exchange Notes' business address was 5011 Southpark Drive, Suite 240, Durham, North Carolina. This is the same address that DWM used in North Carolina. (Compl. ¶ 117.)

49.     On 28 February 2019, the North Carolina Secretary of State suspended IQMAX's status as a North Carolina corporate entity, and on 24 June 2019, the North Carolina Secretary of State revoked IQMAX's authority to transact business in North Carolina. (Compl. ¶ 118.)

### The Montague/Integro Investment

50.     In March 2012, DWM invested $100,000.00 of Plaintiff's funds in Montague Capital, LP ("Montague").  Montague was allegedly a "feeder" of funds to IQMAX.  Neither Davis nor Abolins disclosed the relationship between Montague and IQMAX to Plaintiff.  (Compl. ¶ 121.)

51.     DWM, Montague and Exchange Notes all shared the same business address. (Compl. ¶ 123.)

52.     Montague invested in a company called Integro Earth Fuels ("Integro"). (Compl. ¶ 122.)  One of Integro's directors was Collins.  (Compl. ¶ 124.)   He was also the officer or director of other companies in which Davis invested client funds. (Compl. ¶ 124–25.)  Plaintiff alleges that Collins profited from investments, and then "turn[ed] around and pa[id] Davis a 'commission' for the same investment."  (Compl. ¶ 125.)  This arrangement, through Montague, was not disclosed to Plaintiff.  (Compl. ¶ 126.)

53.     On 13 October 2017, the North Carolina Secretary of State suspended Integro's corporate charter.  This information was not disclosed to Plaintiff.  (Compl. ¶ 129.)

### The Pacific E-Commerce Investment

54.     At some point between 2012 and 2017, Davis advised Plaintiff to invest $51,000.00 in Pacific E-Commerce LLC ("Pacific").  (Compl. ¶ 130.)  Montague was the Managing Member of Pacific.  (Compl. ¶ 131.)

55.    Pacific shared the same business address with DWM, Exchange Notes, and Montague.  The principals of DWM, Abolins and Davis, controlled these entities. (Compl. ¶ 131.)

56.    Plaintiff's Complaint is not definitive with respect to the nature of Plaintiff's investment in Pacific.  Some of DWM's records reflect that Plaintiff received a convertible promissory note in exchange for cash, but records reflect that the investment was for preferred stock in "SleepSafeDrivers, Inc." ("SleepSafe"). Pacific's records reflect that the investment was for equity in Pacific.  (Compl. ¶ 130.)[2]

57.    Pacific's purported primary purpose was to invest in Yobrand, Ltd. ("Yobrand"), a company that held assets in companies in Hong Kong and China. (Compl. ¶ 132.)  However, Davis told Plaintiff that his investment in Pacific was actually an "indirect investment" into SleepSafe.  (Compl. ¶ 134.)

58.    Pacific described Yobrand as having multiple layers of equity holdings which would make it more difficult to reach assets in the event of liquidation. No audited financials were available for Yobrand, and the company was dissolved by the Chinese government in 2016.  Neither Abolins nor Davis told Plaintiff any of this information.  (Compl. ¶ 133.)

59.    On 17 January 2017, Abolins emailed Plaintiff sending him paperwork to issue SleepSafe stock "direct" to each member in order to "reduce [DWM's] cost and eliminate a K-1[.]"  (Compl. ¶ 134.)  Abolins directed Plaintiff to sign a "joinder agreement" stating that Pacific wished to transfer to Plaintiff shares of preferred

---

[2] The Complaint does not describe what relationship, if any, existed between Pacific and SleepSafe.

stock in SleepSafe.  Abolins offered no other explanation about this investment.  He did not explain why this action was being taken or why the stock certificate subsequently issued to Plaintiff was backdated to 30 November 2016.  (Compl. ¶ 134.)

60.     DWM continued to carry Plaintiff's investments in Montague and Pacific on its books as having value, and it charged fees for the investments when they were worthless.  (Compl. ¶ 137.)

### The ADA Capital Investment

61.     On 7 February 2013, DWM, through Davis, invested $100,000.00 of Plaintiff's funds in ADA Capital Group, Inc. ("ADA Capital"), a company Davis and Collins created on 2 July 2012.  (Compl. ¶¶ 160–65.)  Collins was President, Chief Executive Officer and Director, while Davis was Vice President, Chairman of the Board, and later, President.  (Compl. ¶ 161.)

62.     ADA Capital had the same business address as DWM, Exchange Notes, Montague and Pacific.  (Compl. ¶ 162.)  Its business was described in filings with the North Carolina Secretary of State as "investing."  (Compl. ¶ 160.)  The description was later changed to "Holding Company."  (Compl. ¶ 162.)

63.     Unbeknownst to Plaintiff, Davis owned almost half of ADA Capital and was paying himself $10,000.00 a month in salary, taken directly out of incoming investment funds.  (Compl. ¶¶ 166–67.)  Collins took 20% of the company's gains in addition to a 2% management fee.  (Compl. ¶ 167.)

64. Hundreds of thousands of dollars were paid to Davis and Collins in the form of administrative services, director fee expenses, professional fees, and management fees. (Compl. ¶ 168.)

65. In addition, despite the fact that ADA Capital's net income was negative, DWM collected its fee for this investment from Plaintiff. (Compl. ¶ 168.)

66. ADA Capital invested in CarFab for, among other things, payroll and severance payments to executives. (Compl. ¶ 170.) The money was used to cover other losses at CarFab, including to repay Davis for a loan and to redeem other investors. (Compl. ¶¶ 172–73.) Neither Davis nor Abolins informed Plaintiff. (Compl. ¶ 173.)

67. Abolins, who was "in charge of detecting and disclosing conflicts of interest" for DWM, "never intervened or took action to protect [P]laintiff." (Compl. ¶ 163.)

### The South Carolina Securities Division Investigation

68. The South Carolina Securities Division began an investigation of DWM and Davis in early 2017. (Compl. ¶ 31.)

69. The Commissioner of the South Carolina Securities Division determined that Davis, "acting on behalf of DWM," had:

   a. Recommended to one or more South Carolina client(s) that the client(s) invest in private placements not suitable or appropriate for the client(s) given the client(s) investment objective(s) and risk profile(s), and

   b. Failed to disclose one or more conflicts of interest . . . that may have influenced the giving of such advice[.]

(Compl. ¶ 32.)

70. Defendants did not inform Plaintiff of the South Carolina Securities Commissioner's determination. (Compl. ¶ 33.)

71. On 17 March 2017, the Commissioner permanently barred Davis and DWM from participating in any aspect of the securities industry in or from the state of South Carolina. (Compl. ¶ 33.) Defendants did not inform Plaintiff of this administrative action against Davis and DWM. (Compl. ¶ 33.)

First Oak Wealth Management

72. On 20 January 2017, Abolins filed Articles of Organization with the North Carolina Secretary of State to create First Oak. (Compl. ¶ 37.)

73. On 20 February 2017, First Oak entered into an Asset Purchase Agreement with DWM to purchase securities accounts owned by DWM. (Compl. ¶ 38.)

74. On 28 March 2017, DWM filed its Form ADV with the SEC making the following representations, among others:

   a. DWM provides "continuous and regular supervisory or management services to [its] securities portfolios;"

   b. DWM had no "identifiable conflicts of interest . . .;"

   c. DWM was not "an adviser to any private fund;"

   d. DWM did not have any "Sales Interest in Client Interactions;"

   e. DWM did not "recommend purchase of securities to advisory clients . . . for which [DWM] or any related person serves as underwriter, general, or managing partner, or purchaser representative;" and

   f. DWM Advisors did not "recommend purchase or sale of securities to advisory clients . . . for which [DWM] or any related person has any other sales interest . . . ."

(Compl. ¶¶ 76(A)–(I).)

75. DWM, "through Abolins and Davis," falsely answered "No" to the following questions on the Form ADV:

    a. Has any federal regulatory agency, any state agency, or any foreign financial regulatory authority ever found you or any advisory affiliated to have made a false statement or omission, or been dishonest, unfair, or unethical?

    b. Has any federal regulatory agency, any state agency, or any foreign financial regulatory authority ever found you or any investment advisory affiliated to have been involved in a violation of investment-related regulations or statutes?

    c. Has any federal regulatory agency, any state agency, or any foreign financial regulatory authority in the past ten years, entered an order against you or any advisory affiliated in connection with an investment-related activity?

(Compl. ¶¶ 77(A)–(C), 78.)

76. DWM also falsely answered "No" to the following questions:

    a. Are you or any advisory affiliate now the subject of any regulatory or civil proceeding that could result in a 'yes' answer to any part of [the SEC's question set forth above]?  (Compl. ¶¶ 79, 81.)

    b. Has any domestic or foreign court ever dismissed, pursuant to a settlement agreement, an investment-related civil action brought against your or any advisory affiliate by a state or foreign financial authority?  (Compl. ¶ 80.)

77. Neither Davis nor Abolins disclosed to Plaintiff that DWM had given false information to the SEC.  (Compl. ¶ 82.)

78. On 11 April 2017, First Oak filed for registration as a registered investment adviser with the Secretary of State of North Carolina.  (Compl. ¶ 40.)

79.     On 27 April 2017, Abolins wrote Plaintiff with a status update regarding DWM and First Oak.  His letter included the following representations:

   a. "[W]e've completed the transition from DWM Advisors to First Oak Wealth Management."

   b. "[E]verything is business as usual as we service and manage your accounts."

   c. The "branding" was going to be changed to reflect First Oak Wealth Management on all future correspondence.

 (Compl. ¶ 40.)

80.     On 3 May 2017, the North Carolina Secretary of State approved First Oak as an investment adviser, and First Oak took over DWM's accounts.  (Compl. ¶¶ 42–43.)   First Oak, "through defendant Abolins and others," began informing clients that their accounts were being moved as part of a "branding" change.  (Compl. ¶ 43.)

81.     First Oak, "primarily through Abolins," informed Plaintiff that the new company was designed to be an improvement over the old company and "would have better operational capacity, including 'back office and compliance support.' " Everything else, according to Abolins, was "business as usual."  (Compl. ¶ 44.)

82.     On 1 May 2017, Davis terminated his status as an investment adviser representative with DWM Advisors.  (Compl. ¶ 41.)  Davis never registered as an investment adviser representative with First Oak.  (Compl. ¶ 46.)

83.     However, First Oak, "through Abolins," sent emails and other correspondence to DWM clients identifying Davis as a member of the "First Oak

Team."  (Compl. ¶ 45.)  First Oak also had Davis reach out personally to reassure clients that they would be well taken care of by First Oak.  (Compl. ¶ 45.)

84.    Plaintiff was not informed that Davis was acting as an unregistered investment adviser representative.  (Compl. ¶¶ 46–48.)

85.    On 17 May 2017, the SEC imposed sanctions against Davis, barring him from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.  (Compl. ¶ 50.)  The SEC found that the South Carolina Securities Commissioner had determined that Davis had "failed to disclose one or more conflicts of interest that may have influenced the giving of [investment] advice."  Plaintiff was not informed of the SEC action.  (Compl. ¶¶ 49–51.)

86.    On 8 April 2019, the Securities Administrator of the North Carolina Secretary of State (the "North Carolina Securities Division"), having learned that First Oak was employing Davis as an investment adviser representative, entered an order making the following findings of fact:

    a.  That Davis solicited or offered or negotiated the sale of investment advisory services for First Oak;

    b.  That First Oak did not notify its clients that Davis was not registered in North Carolina as an investment adviser representative; and

    c.  That First Oak did not inform clients that Davis had been permanently barred from participating in any aspect of the securities business in or from the State of South Carolina.

(Compl. ¶ 54(A)–(C).)

87.    First Oak falsely told the North Carolina Securities Division that it had notified its clients of the South Carolina Order by letter dated 27 March 2019 when it had not.  (Compl. ¶ 55.)

88.    The North Carolina Securities Division made the following conclusions of law:

   a.  First Oak utilized Davis as an investment adviser representative without registering him as required by N.C.G.S. § 78C-16(b);

   b.  Utilizing Davis as an unregistered investment adviser representative violated state law; and

   c.  First Oak failed to comply with state law when it did not provide written information about Davis, including information regarding his disbarment from the securities industry, to its clients.

(Compl. ¶ 57(A)–(C).)

89.    The North Carolina Securities Division then ordered First Oak (the "Order"):

   a.  To cease and desist from violating the North Carolina Investment Advisers Act, and the related regulations in the North Carolina Administrative Rules promulgated thereunder;

   b.  To pay a civil monetary penalty to the State of North Carolina for $25,000;

   c.  To pay $55,000 to the State of North Carolina to cover the costs of the investigation of First Oak undertaken by the State; and

   d.  That First Oak shall not take any action, or permit to be made any public statement, denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis.

(Compl. ¶ 58.)

90.    First Oak consented in writing to entry of the Order.  (Compl. ¶ 59.)

91.     In filings with the SEC, First Oak described the action taken against it as follows:

> The findings [of the N.C. Secretary of State] were that First Oak utilized a solicitor without registration as an investment adviser representative for the purpose of soliciting new clients whose accounts were purchased by First Oak from the solicitor's former investment advisory firm. It was also found that First Oak failed to reasonably supervise this solicitor, and violated the brochure supplement requirement and solicitor rule regarding this solicitor.

(Compl. ¶ 60.)

92.     Plaintiff alleges that First Oak's rebranding was done to defraud Plaintiff "and to outrun . . . the regulatory 'hammers' that had been imposed" by the various regulatory agencies. (Compl. ¶ 62.)

93.     Plaintiff alleges that First Oak is "nothing less than a mere continuation" of DWM and that First Oak was not a "good faith purchaser for value" of DWM's assets. (Compl. ¶ 63.)

94.     Plaintiff brought this suit on 1 October 2021, including claims against all Defendants for constructive fraud, common law fraud, violation of the North Carolina Investment Advisers Act, *see* N.C.G.S. § 78C-38, negligent misrepresentation, and violation of the North Carolina Racketeer and Influenced Corrupt Organizations Act ("RICO"), *see* N.C.G.S. § 75D-1. Defendants First Oak and Abolins have moved to dismiss. The Motions were fully briefed, and the Court held a hearing on the Motions on 3 March 2022. Defendants First Oak, Abolins, and Plaintiff were present and were heard. Defendants Davis and DWM did not appear. The Motions are now ripe for disposition.

## II.    ANALYSIS

### A.    Legal Standard

95.    When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987) (citation omitted).

96.    The Court must construe the complaint liberally and accept all-well pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577 (2009). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (citation and quotation marks omitted).

97.    "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)).

98.    While the Court may consider "documents that are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant," *S. Env't Law Ctr. v. Saylor*, 2019 NCBC LEXIS 60,

at *11 (N.C. Super. Ct. Sept. 11, 7 2019) (citing *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001)), the Court may not consider documents presented as evidence that are not the subject of this action without converting the motion to one for summary judgment. *Gao v. Sinova Specialties, Inc.*, 2018 NCBC LEXIS 71 at *26 (N.C. Super. Ct. July 6, 2018) ("Where a claimant simply refers to a document that was not the subject of her action, and the movant attaches that document or an affidavit concerning that document to support a Rule 12(b)(6) motion, the trial court's consideration of that document converts the motion into one for summary judgment.") (quoting *Holton v. Holton*, 2018 N.C. App. LEXIS 297, at *19 (N.C. Ct. App. Mar. 20, 2018)).

99.    However, "[w]here it is clear from the record, namely from the order itself, that the additional materials were not considered by the trial court, the 12(b)(6) motion is not converted into a Rule 56 motion." *Estate of Belk v. Boise Cascade Wood Prods., L.L.C.*, 263 N.C. App. 597, 599 (2019).

B.    Constructive Fraud Claim Against Abolins and First Oak

100.    Abolins and First Oak each argue that Plaintiff's constructive fraud claim fails because Plaintiff has not alleged that either of them owed Plaintiff a fiduciary duty. (Mem. Supp. Def. Airis Alexander Abolins' Mot. Dismiss 10, ECF No. 10; Def. First Oak's Mem. Supp. Mot. Dismiss 13, ECF No. 15.)  Plaintiff responds that both Abolins and First Oak were Plaintiff's "Registered Investment Advisers," and that pursuant to the North Carolina Administrative Code, 18 NCAC 06A.1801(a), they are fiduciaries as a matter of law.  In any event, he argues, the facts alleged give

rise to a *de facto* fiduciary duty owed by both of them to Plaintiff. (Pl.'s Br. Opp. Def. Airis Alexander Abolins' Mot. Dismiss 24, ECF No. 24; Pl.'s Br. Opp. Def. First Oak's Mot. Dismiss 19, ECF No. 27.)

101. To establish a constructive fraud claim, a plaintiff must allege: "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Self v. Yelton*, 201 N.C. App. 653, 660 (2010) (citation and quotation marks omitted).

102. First and foremost, "[a] claim for constructive fraud requires the presence of a confidential or fiduciary relationship between the parties." *DS & T II, Inc. v. D & E Tax & Accounting, Inc.,* 2021 NCBC LEXIS 87, at \*18 (N.C. Super. Ct. Oct. 4, 2021) (citing *Forbis v. Neal*, 361 N.C. 519, 528 (2007)). "Absent such a relationship, Plaintiff's claim necessarily fails." *Id.* (citing *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC,* 2021 NCBC LEXIS 15, at \*14 (N.C. Super. Ct. 18 Feb. 2021) ("A claim for constructive fraud . . . requires a plaintiff to allege facts establishing a confidential or fiduciary relationship.").

103. "North Carolina recognizes certain *de jure* fiduciary relationships which arise as a matter of law because of the nature of the relationship, 'such as attorney and client, broker and principal, executor or administrator and heir, legatee or devisee, factor and principal, guardian and ward, partners, principal and agent, trustee and cestui que trust.' " *BDM Invs. v. Lenhil, Inc.*, 2012 NCBC LEXIS 7, at

*89 (N.C. Super. Ct. Jan. 18, 2012) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)). In addition, an investment adviser "is a fiduciary and has a duty to act primarily for the benefit of its clients." 18 N.C. Admin. Code 06A.1801(a) (2022). *But see Silverdeer, LLC v. Berton*, 2013 NCBC LEXIS 21, at *27 (N.C. Super. Ct. Apr. 24, 2013) ("[T]he mere assertion of an investment advisor-client relationship or reliance upon [N.C.G.S.] 78C *et. seq*. does not give rise to a *de jure* fiduciary relationship.").

104. "North Carolina courts have found that the relationship between an unsophisticated investor and a financial advisor can be a [*de facto*] fiduciary one depending on the circumstances." *Howell v. Heafner*, 2020 NCBC LEXIS 105, at *35 (N.C. Super. Ct. Sept. 11, 2020) (citing *Beam v. Sunset Fin. Servs., Inc.* 2019 NCBC LEXIS 56, at *11 (N.C. Super. Ct. Sept. 3, 2019) (holding *de facto* fiduciary relationship where plaintiffs "were an elderly couple who lacked financial sophistication and who not only came to trust [defendant] as their investment adviser, but also 'involved [defendant] in virtually every aspect of their lives' "); *see also Edwards v. Vanguard Fiduciary Trust Co.*, 2018 NCBC LEXIS 237, at *20–21 (N.C. Super. Ct. Dec. 21, 2018) (*de facto* fiduciary relationship exists where plaintiff "relied upon [defendant's] 'reputation as a safe, secure investment company[,]' that [defendant] 'knew or should have known that [p]laintiff was placing his trust and confidence in [defendant] to look out for the best interests of [p]laintiff[,]' and that [defendant's] very name, 'including the words "fiduciary" and "trust" . . . create[d] a reasonable belief on the part of [p]laintiff that [defendant] stands in a fiduciary relationship with [p]laintiff[.]' " (citations omitted)); *Austin v. Regal Inv. Advisors,*

*LLC,* 2018 NCBC LEXIS 3, at *20–21 (N.C. Super. Ct. Jan. 8, 2018) (*de facto* fiduciary relationship exists where plaintiffs were unsophisticated investors who "relied on [defendants] for their financial expertise to manage their investment accounts").

105. A fiduciary relationship is one where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . ." *Dalton v. Camp,* 353 N.C. 647, 651–52 (2001). Domination and influence are essential components of a *de facto* fiduciary relationship. *Id.* at 652. But the facts required to establish such a relationship are exacting: "[o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC,* 189 N.C. App. 601, 613 (2008) (quotation omitted); *Lockerman v. S. River Elec. Membership Corp.,* 250 N.C. App. 631, 638–39 (2016).

106. Plaintiff alleges that Abolins was a registered investment adviser. (Compl. ¶¶ 18, 41, 182.) DWM and First Oak are also alleged to have been registered investment advisers at all relevant times. (Compl. ¶¶ 18, 40, 42 69(C), 199.) Consequently, pursuant to 18 N.C. Admin. Code 06A.1801(a), they are fiduciaries *de jure.*[3] *Cf. SEC v. Capital Gains Rsch. Bureau, Inc.,* 375 U.S. 180, 201 (1963) (holding that investment advisers registered under federal law are fiduciaries).

---

[3] Both the individual adviser and the firm with which the adviser works may be registered investment advisers and, as a result, concurrently owe fiduciary duties to clients. *See, e.g.,* *SEC v. Bolla*, 401 F. Supp. 2d 43, 61 (D.D.C. 2005).

107. Furthermore, Plaintiff alleges sufficient facts to support an allegation that a *de facto* fiduciary relationship existed between Defendants and himself. He alleges that, while highly educated, he "lack[ed] expertise and a work history in the fields of finance and financial planning." (Compl. ¶ 15; *see also* Compl. ¶ 195). Therefore, he gave both Abolins and Davis complete "discretionary authority" to manage his accounts, and Defendants "were not required to consult with [him] before making an investment decision on his behalf." (Compl. ¶ 21.) He further alleges that "Defendants directly represented to plaintiff that they were operating in a fiduciary role with respect to their work for him." (Compl. ¶ 183.)

108. As for First Oak, at least from the time it came into existence, Plaintiff alleges that Davis and Abolins "served their fiduciary roles while acting on behalf of . . . First Oak." (Compl. ¶ 183.) He alleges, broadly, that he relied on Defendants because "they were vested with superior knowledge about the subject of finance and investments, and plaintiff was therefore not on equal footing[.]" (Compl. ¶ 196.) The Court concludes that Plaintiff sufficiently alleges that both Abolins and First Oak were his fiduciaries.

109. Once a fiduciary relationship is established, "[a] claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud." *Hunter v. Guardian Life Ins. Co. of Am.,* 162 N.C. App. 477, 482 (2004) (quoting *Terry v. Terry,* 302 N.C. 77, 83 (1981) (quotation marks omitted). "Constructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific misrepresentation." *Id.* (citing *Barger v. McCoy Hillard & Parks,* 346 N.C.

650, 666 (1997) (quotation marks omitted)). Thus, "[w]hen a fiduciary relation exists between parties to a transaction, equity raises a presumption of fraud when the superior party obtains a possible benefit." *Watts v. Cumberland Cnty. Hosp. Sys., Inc.,* 317 N.C. 110, 116 (1986) (citation omitted). "This presumption arises not so much because [the fiduciary] has committed a fraud, but [because] he may have done so." *Id.* (quoting *Atkins v. Withers*, 94 N.C. 581, 590 (1886) (quotation marks omitted)).

110. Abolins argues that Plaintiff "never alleges [Plaintiff] even talked to Abolins or that Abolins recommended any particular investment." (Memo. Supp. Def. Airis Alexander Abolins' Mot. Dismiss 10.) However, the pleading requirements for constructive fraud do not require the same level of specificity that is required to plead fraud. *See, e.g.*, *Hunter*, 162 N.C. App. at 482. Instead, "[a] constructive fraud complaint must allege facts and circumstances '(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.' " *Id.* at 482 (citation omitted); *Beam,* 2019 NCBC LEXIS 56, at *12 (" 'A claim of constructive fraud does not require the same rigorous adherence to elements of actual fraud[,]' and accordingly does not need to meet the Rule 9(b) pleading requirement." (quoting *Hunter*, 162 N.C. App. at 482)).

111. The Court determines that Plaintiff has asserted sufficient allegations against both Abolins and First Oak to meet his pleading requirements with respect to this claim. Although the Complaint focuses heavily on Plaintiff's relationship with

Davis and DWM, Plaintiff alleges that Abolins, as Chief Investment Officer for DWM, was responsible for disclosing Davis's conflicts of interest and failed to do so. (*See, e.g.*, Compl. ¶ 119.)

112. Finally, Plaintiff must allege that Abolins and First Oak "sought to benefit [themselves] in the transaction." *Self,* 201 N.C. App. at 660. Abolins argues that Plaintiff's claim fails on this basis because the fees paid for investment advisory services were for work performed. (Mem. Supp. Def. Airis Alexander Abolins' Mot. Dismiss 10.) The Court disagrees.

113. While it is true that "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage[,] " *id.* (quotation omitted), Plaintiff has alleged that Abolins breached his fiduciary duty to "generate illicit pecuniary gains for [himself], outside and separate from any lawful compensation that plaintiff might have owed [him,]" (Compl. ¶ 189). Further, Plaintiff has alleged that Abolins "[d]eceitfully and intentionally inflate[d] the value of companies . . . in distress . . . for the purpose of collecting increased and improper advisory fees[.]" (Compl. ¶ 189(C)). These allegations are sufficient to meet threshold pleading requirements for constructive fraud.

114. The same analysis applies to First Oak, except that First Oak argues that it cannot be held liable as a fiduciary for alleged bad actions that took place before it existed. (Def. First Oak's Mem. Supp. Mot. Dismiss 13–14.) Citing *Howell,* 2020 NCBC LEXIS 105, at *29–30, First Oak points out that no North Carolina case

has found that a fiduciary relationship was "formed between an investor and investment advisor before the investor signed account documents and entrusted funds to the advisor for investment." (Def. First Oak's Mem. Supp. Mot. Dismiss 13.)

115.    The Court determines that, at least from the date it registered as an investment adviser and took over Plaintiff's account, First Oak was Plaintiff's fiduciary.[4]    But Plaintiff argues that First Oak's responsibilities as a fiduciary predate its existence, either because it is no more than a mere continuation of DWM or because there was a *de facto* merger between DWM and First Oak. (Compl. ¶¶ 61–64.)

116.    It is well-established that "absent special circumstances, a transferee of assets does not become responsible for the liabilities of the transferor merely by acquiring all the assets of the transferor[.]" Robinson, North Carolina Corporation Law and Practice, § 25.05 (2022); *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 689 (1988); *Transatlantic Healthcare, LLC v. Alpha Constr. of the Triad, Inc.*, 2017 NCBC LEXIS 21, at *22 (N.C. Super. Ct. Mar. 9, 2017).   However, exceptions exist for *de facto* mergers, and when the purchasing entity is a "mere continuation" of the seller. *Lattimore & Assocs., LLC v. Steaksauce, Inc.*, 2012 NCBC LEXIS 34, at *16 (N.C. Super. Ct. May 25, 2012).

---

[4] On 27 April 2017 Abolins wrote Plaintiff regarding the transition of his account from DWM to First Oak, and First Oak took over the accounts as soon as its registration was approved on 3 May 2017.

117. While in some instances courts have found successor liability when there is either substantial continuity of ownership between the two entities at issue,[5] or even in the rare case when there is no continuity of ownership,[6] in cases involving the sale of assets, North Carolina follows a more traditional rule. "The traditional rule regarding 'mere continuation' is that 'a corporate successor is the continuation of its predecessor if only one corporation remains after the transfer of assets and there is *identity of stockholders and directors* between the two corporations.'" *G.P. Publ'ns Inc,* 125 N.C. App. at 434 (citations omitted) (emphasis added). In short, "[t]his exception encompasses the situation where one corporation sells its assets to another with the *same people* owning both corporations." *Id.* (citations omitted) (emphasis added).

118. First Oak relies on representations made in another lawsuit to argue that it is not a "mere continuation" of DWM because there is no continuity of ownership between the entities. (Def. First Oak's Mem. Supp. Mot. Dismiss 19–20.) However, on this Motion, the Court may not consider evidence that is not the subject of the Complaint. *See Gao*, 2018 NCBC LEXIS 71, at *26.

---

[5] The "substantial continuity" test places greater emphasis on other factors of the mere continuation doctrine and originated in cases involving labor relations, products liability and environmental regulation, none of which is involved here. *See G.P. Publ'ns v. Quebecor Printing*, 125 N.C. App. 424, 436 (1997).

[6] *See L.J. Best Furniture Distribs. v. Capital Delivery Serv.*, 111 N.C App. 405 (1993) (finding summary judgment inappropriate where facts involved ownership transfer to members of same family, grossly inadequate consideration, and transfer of employees and significant assets).

119.     In addition to continuity of ownership, however, there are two other factors to be considered: (1) inadequate consideration for the purchase; and (2) lack of some of the elements of a good faith purchaser for value. *G.P. Publ'ns*, 125 N.C. App. at 435 (citation omitted).

120.     Plaintiff's allegations regarding inadequacy of consideration and lack of the elements of a good faith purchase are conclusory at best.  As for inadequate consideration, Plaintiff alleges only that, "[u]nder the APA, [First Oak] 'purchased' securities accounts owned by DWM[,]" (Compl ¶ 38), and "[DWM] simply handed over millions of dollars of client accounts to [First Oak][,]" (Compl. ¶ 63).  As far as lacking the elements of a good faith purchaser, Plaintiff alleges only "[First Oak] was not a 'good faith purchaser for value' of [DWM]'s 'assets'." (Compl. ¶ 63.)  Particularly given the policy implications involved with the imposition of successor liability on the purchasers of assets, facts, not conclusory allegations, must be pled with respect to these key elements. *Sykes v. Health Network Sols., Inc.,* 2018 NCBC LEXIS 29, at *44 (N.C. Super. Ct. Apr. 5, 2018) ("[E]ven North Carolina's more lenient standard does not allow a party to withstand a Rule 12(b)(6) motion based on conclusory allegations that are not supported by underlying factual allegations." (quotation omitted)).  Accordingly, the Court determines that Plaintiff has not sufficiently pled that First Oak is a mere continuation of DWM and should be liable as DWM's successor on that basis.

121.     As for *de facto* merger, the North Carolina Court of Appeals has cited the doctrine in *dicta* but our appellate courts have yet to recognize it.  *See* Robinson,

North Carolina Corporation Law and Practice, § 25.04 (2022) (citing *Budd Tire Corp.*, 90 N.C. App. at 687 and *Transatlantic Healthcare, LLC*, 2017 NCBC LEXIS 21).

122. This Court had occasion to consider the *de facto* merger doctrine in *Lattimore & Associates, LLC v. Steaksauce, Inc.*, 2012 NCBC LEXIS 34 (N.C. Super. Ct. May 25, 2012). In *Lattimore,* Judge Murphy first identified the "traditional" elements of the *de facto* merger doctrine recognized outside of North Carolina:

> (1) continuation of the management, personnel, physical location, assets, and general business operations of the seller; (2) continuity of shareholders achieved by paying for the acquired assets via transfer, to the seller's shareholders, of shares in the purchasing corporation; (3) the seller "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible"; and (4) assumption by the purchaser of "those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller.

*Id.* at \*34–35 (quoting *Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc.*, Nos. 90-2621, 90-2630, 90-2637, 1991 U.S. App LEXIS 4805, at \*8 (4th Cir. 1991)).  Judge Murphy then concluded that there was no "compelling justification" for adopting a more expansive version of the doctrine "than that enunciated by the traditional four-elements test, with continuity of ownership being determinative." *Id.* at \*45–46; *see also Zdanowski v. Digital Health Dep't, Inc.,* No. 5:17-CV-0127 (GTS/DEP), 2017 U.S. Dist. LEXIS 143293, at \*14 (N.D.N.Y 2017) ("[T]o state a claim under [a *de facto* merger theory of successor liability], Plaintiff must allege facts plausibly suggesting the four elements of a *de facto* merger.").

123. Here, the Court is unable to consider the evidence of ownership offered by First Oak with respect to this Rule 12(b)(6) Motion.  However, even without it, Plaintiff's pleading does not allege the elements necessary to assert the existence of

a *de facto* merger. The Court finds no allegation that the purchase of DWM's assets was made by stock transfer or that First Oak assumed DWM's operating expenses. Thus, the second and fourth *Lattimore* factors have not been pled.

124. Having determined that factors necessary for application of the mere continuation and *de facto* merger successor liability theories have not been sufficiently alleged, the Court addresses the adequacy of the allegations against First Oak alone, without consideration of DWM's potential liability, and finds them sufficient to withstand the Motion.

125. Plaintiff adequately alleges that First Oak is liable for the constructive fraud that allegedly occurred after it came into existence, such as failing to register Davis as an investment adviser representative; allowing Davis to continue advising Plaintiff after he had been "barred" from the securities industry; and failing to disclose that DWM and First Oak had been cited for unlawful conduct by regulatory authorities—all in an effort to "pilfer" investment monies and fees from Plaintiff. (Compl. ¶ 189.) Therefore, Plaintiff's claim for constructive fraud against First Oak after it became his fiduciary may proceed.

126. In summary, the Court GRANTS First Oak's Motion with respect to Plaintiff's claim for constructive fraud to the extent that Plaintiff seeks to recover for conduct that preexisted the formation of the fiduciary relationship between Plaintiff and First Oak, and to that extent, the claim is DISMISSED without prejudice. The Court otherwise DENIES First Oak's Motion with respect to Plaintiff's First Cause of Action. Abolins' Motion with respect to the First Cause of Action is also DENIED.

C.      Common Law Fraud Claim Against Abolins and First Oak

127.   As a preliminary matter, First Oak argues that the statute of limitations bars Plaintiff's common law fraud claim.  The statute of limitations for actions of fraud is three years.  N.C.G.S. § 1-52(9).  However, "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud[.]"  *Id*.  " 'Discovery' is defined as an actual discovery or the time when the fraud should have been discovered in the exercise of due diligence."  *Carlisle v. Keith*, 169 N.C. App. 674, 683 (2005) (quotation omitted).

128.   Ordinarily, determining when fraud should have been discovered is a question of fact to be answered by a jury.  *Forbis*, 361 N.C. at 524.  However, dismissal is appropriate if the complaint on its face includes facts establishing that the discovery occurred more than three years prior to the lawsuit.  *See Carlisle*, 169 N.C. App. at 681–84.

129.   First Oak argues that "Plaintiff knew as early as 2011, and not later than January 2017, that several of the investments recommended for Plaintiff by DWM were performing in contravention to his strategy and goals," and that this knowledge "triggered Plaintiff's obligation to inquire into the health of his investments."  (Def. First Oak's Mem. Supp. Mot. Dismiss 12.)   First Oak contends that because Plaintiff's investment goals were to invest in "cash and bonds, with the minority of his investment in large cap, small cap, and international developed stocks[,]" he should have been on notice that something was amiss "when several of

the investments recommended for Plaintiff . . . were performing in contravention to his strategy and goals." (Def. First Oak's Mem. Supp. Mot. Dismiss 12.)

130. Plaintiff responds that DWM and then First Oak, as well as Abolins on their behalf, concealed the misconduct, preventing its discovery. Among other allegations, Plaintiff points to his contention that Defendants sent him false or inflated account statements. (*See, e.g.*, Compl. ¶ 254.)[7] Plaintiff also contends that, due to his lack of financial expertise, he relied on Defendants' superior knowledge as his fiduciaries, and he had no reason to suspect wrongdoing. In light of these and other allegations, the Court cannot conclude at this stage that Plaintiff should have discovered the alleged wrongdoing before he did. *See Hunter,* 162 N.C. App. at 486 ("[D]etermining when plaintiff should, in the exercise of reasonable care and due diligence, have discovered the [alleged] fraud is a question of fact to be resolved by the jury.").

131. Turning to the substantive allegations of Plaintiff's fraud claim against Abolins, Plaintiff alleges that Abolins made both affirmative misrepresentations and that he concealed material facts regarding the transition from DWM to First Oak, the true value of Plaintiff's investments, and the various conflicts of interest that existed with respect to those investments.

132. The essential elements of fraud are "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured

---

[7] See also Plaintiff's allegations with respect to fraudulent concealment, discussed *infra* ¶¶ 142–46.

party." *Terry*, 302 N.C. at 83 (citation omitted).  Additionally, Plaintiff's reliance on any misrepresentations must be reasonable.  *State Props., LLC v. Ray*, 155 N.C. App. 65, 72–73 (2002).

133.   "North Carolina permits fraud claims to be based on either affirmative misrepresentations or by concealment or nondisclosure of material facts."  *Beam,* 2019 NCBC LEXIS 56, at *14–15 (citing *Kron Med. Corp. v. Collier Cobb & Assocs., Inc.*, 107 N.C. App. 331, 339 (1992)).  But "[f]raud claims based on both theories must be pled with particularity pursuant to Rule 9(b), [and] what is required to meet that standard differs between the two." *Id.* at *15.

134.   To state a fraud claim premised on affirmative misrepresentations, "a plaintiff must allege (1) the time, place and content of the misrepresentation, (2) the identity of the person making the representation and (3) what was obtained as a result of the fraudulent acts or representations." *Id.* (citing *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *21 (N.C. Super. Ct. Jan. 28, 2015)). "A claim for fraud in a complaint that omits any reference to a day, month, or year is properly dismissed for violation of Rule 9[.]" *Bybee v. Island Haven, Inc.,* No. COA17-859, 2018 N.C. App. LEXIS 787, *1 (N.C. Ct. App. Aug. 7, 2018).

135.   Additionally, "[t]he alleged misrepresentations must also be . . . more than mere puffing, guesses, or assertions of opinions but actual representations of material facts." *Id.* (quoting *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992) (internal quotation marks omitted)); *Aldridge v. Metro. Life Ins. Co.,* 2019 NCBC LEXIS 116, at *75 (N.C. Super. Ct. Dec. 31, 2019) ("The alleged

misrepresentations must also be definite and specific, meaning that they must be more than mere puffing, guesses, or assertions of opinions but actual representations of material facts.") (internal quotation marks and citations omitted).

136. On the other hand, when a fraud claim is based on concealment or nondisclosure of material facts, a plaintiff must allege that the defendant "had a duty to disclose material information [to the plaintiff], as silence is fraudulent only when there is a duty to speak." *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *8 (N.C. Super. Ct. June 18, 2007)  A plaintiff must also allege the following elements:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Lawrence*, 2007 NCBC LEXIS, at *9–10 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997)).

137. Abolins stresses that the allegations involving transfers of Plaintiff's money involve Davis, not him, and that he simply was not involved. (*See, e.g.*, Compl. ¶¶ 91, 103, 121, 130, 139, 140, 155, 165.)  He points to Plaintiff's allegations that his adviser was Davis. (*See, e.g.*, Compl. ¶¶ 66–68.)  He argues that it is not surprising, then, that any claim for fraud resulting from alleged affirmative misrepresentations attempted against him fails either because the required elements are either not alleged at all, or because the pleading requirements necessary to meet the heightened

standard of Rule 9 have not been met. (Mem. Supp. Def. Airis Alexander Abolins' Mot. Dismiss 8–10.)

138. After a careful review, the Court concludes that Plaintiff's allegations regarding affirmative representations made by Abolins do not state a claim for fraud. First, Plaintiff's contention that Abolins misled Plaintiff about the transition from DWM to First Oak, (*see* Compl. ¶¶ 44–45), does not satisfy Rule 9 pleading requirements. Statements such as the new company was "designed to be an improvement" and "would have better operational capacity, including back office and compliance support" and everything else with the new company would be "business as usual" are mere puffery or general promotional talk. Moreover, identifying Davis as part of the "First Oak Team" was not a falsehood, despite the fact that his role on the team had changed.

139. Plaintiff alleges that Abolins sent a 17 January 2017 email in which he transmitted to Abolins paperwork regarding SleepSafe stock. (Compl. ¶ 134.) Abolins is also identified as the author of a 5 December 2014 communication to Plaintiff regarding his estate planning. (Compl. ¶ 157.) But Plaintiff does not allege that either of these communications were made with fraudulent intent or were, in fact, false. Consequently, these allegations fail to state a claim for fraud.

140. In addition, throughout the Complaint, Plaintiff repeatedly refers to Abolins and Davis together, without specifying in each instance which of the two is responsible for the alleged misrepresentation. For example, with respect to the IQMAX investment, Plaintiff alleges that on 14 October 2016, DWM, "by and through

defendants Davis and Abolins, [falsely] reassured plaintiff that his 'equity' in IQMAX held a $163,876.59 value (through his account statements and in his discussions with them)." (Compl. ¶ 238(b).) He alleges that despite IQMAX's dire financial situation, "Davis and Abolins continued to make [false] representations to Plaintiff about the company's promise as an investment[,]" (Compl. ¶ 109), and "through at least January 8, 2019, . . . they continued to collect improper fees based on this bogus asset[,]" (Compl. ¶ 111). Rule 9 does not countenance the grouping of defendants when pleading fraud. *See e.g.*, *Oberlin Cap., L.P.*, 147 N.C. App. at 57.

141. Plaintiff's allegations that there were false statements made in various disclosure documents issued by DWM such as Forms ADV, (Compl. ¶¶ 75–82, 234–35), the supplemental brochure, (Compl. ¶ 72), and account statements, (Compl. ¶¶ 198, 238(a)), also fail with respect to Abolins for lack of specificity. Plaintiff alleges that these documents were "authored" or "drafted" by Davis and Abolins, collectively, or that misrepresentations were made "through Davis and Abolins," but he does not identify which statement was made by which Defendant. Consequently, "[t]he language of the Complaint . . . does not alert the court or the Defendants as to which fraudulent representations each Defendant allegedly made." *Shareff v. Lakebound Fixed Return Fund, LLC*, 2013 NCBC LEXIS 14, at *13 (N.C. Super. Ct. Mar. 6, 2013); *see also Oberlin Cap., L.P.*, 147 N.C. App. at 57 (affirming dismissal of claim where plaintiff failed to allege sufficiently any wrongful action on the part of the three defendants because "[e]very allegation made against these three defendants is made

against them collectively[.]")[8]  For these reasons, Abolins' Motion, to the extent it pertains to allegations of affirmative misrepresentations, is GRANTED.

142.  On the other hand, Plaintiff has pleaded fraudulent concealment against Abolins with sufficient particularity to withstand dismissal at this stage.  As stated above, Plaintiff has alleged there was a fiduciary relationship between Plaintiff and Abolins that gave rise to a duty to disclose material facts of which he was aware and that Plaintiff did not know and could not reasonably have discovered.  Plaintiff alleges that Abolins was aware of the wrongs being committed, *(See, e.g., Compl. ¶¶ 117, 131, 253), and that Abolins' role as Chief Investment Officer for DWM made him responsible for disclosing Davis' violations of DWM's Code of Ethics including Davis' various conflicts of interest. (*See, e.g.*, Compl. ¶¶ 166, 227 (alleging that Abolins represented throughout his relationship with Plaintiff that his "primary focus [would be] at the client level . . . making sure 'no stone is left unturned' ").)  But, after describing Davis' alleged conflicts of interest with IQMAX, Plaintiff alleges that "nothing was heard from [Abolins] but his unlawful silence."  (Compl. ¶ 119.)

143.  Plaintiff also alleges that Abolins failed to inform him of the remedial sanctions and securities industry ban on Davis, (*see, e.g.*, Compl. ¶¶ 200, 212), the poor performance of Plaintiff's investments, (*see, e.g.*, Compl. ¶¶ 203–04, 209), and Davis' other conflicts of interest, (*see, e.g.*, Compl. ¶¶ 202, 239–44).  He alleges that Defendants, "through Davis and Abolins, knew that the 'private company'

---

[8] In all, Plaintiff refers to the two individual defendants in the conjunctive more than fifty times.  On at least one occasion, Plaintiff alleges that a misrepresentation was made to SEC agents by Davis but then concludes, "[t]his representation, from Davis *and Abolins*, was false."  (Compl. ¶ 176, emphasis added.)

investments they made or directed plaintiff to make lacked profit potential due to their distressed status. Despite an affirmative duty to speak, defendants did not disclose these highly material facts to plaintiff." (Compl. ¶ 204.) Plaintiff alleges that Defendants were able to continue their securities advisory business and to profit from Plaintiff by withholding this material information. (Compl. ¶¶ 214, 223.)

144. Plaintiff further alleges that his reliance on these omissions was reasonable due to their fiduciary relationship and Abolins' superior knowledge regarding investments. (Compl. ¶¶ 196–97.) Indeed, he alleges that all the Defendants, including Abolins, had "discretionary authority" over Plaintiff's investment accounts and were not required to consult with him before making an investment decision on his behalf. (Compl. ¶ 20.) He alleges that had he known that Davis and Abolins were "repeatedly making false statements to securities regulators, he would have taken immediate action to secure his investments at DWM Advisors." (Compl. ¶ 83.) The Court concludes that with these allegations and others, (*see, e.g.*, Compl. ¶¶ 151, 154, 163, 165–166), Plaintiff has stated a claim against Abolins for fraudulent concealment.

145. For its part, First Oak argues that "Plaintiff's complaint is devoid of allegations to support that an owner, employee, or agent of First Oak made any misrepresentations to Plaintiff at any time" and "is devoid as to the content of any misrepresentations made by First Oak to Plaintiff." (Def. First Oak's Mem. Supp. Mot. Dismiss 11.) However, the Complaint alleges that First Oak is "vicariously liable for the unlawful conduct of Davis and Abolins, under the doctrine of *respondeat*

*superior,*" (Compl. ¶¶ 190–91), and the Complaint is replete with allegations of misrepresentations made by Davis and allegations of fraudulent concealment by both of them. Plaintiff further alleges that First Oak directed or permitted Davis to "reach out personally to reassure clients that they would be well taken care of by the First Oak Team." (Compl. ¶¶ 45, 217.) Finally, Plaintiff contends First Oak sent false account statements to Plaintiff. (Compl. ¶¶ 198, 238(b), 245.) In short, Plaintiff has met his pleading requirements at this stage with respect to his fraud claim against First Oak. "It is elementary that the principal is liable for the acts of his agent, whether malicious or negligent, . . . when the agent or servant is acting within the line of his duty and exercising the functions of his employment." *White v. Consol. Planning, Inc.,* 166 N.C. App. 283, 297 (2004) (quoting *Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 111–12 (1958)).

146. Similarly, Plaintiff's claim for fraudulent concealment against First Oak withstands Rule 12(b)(6) scrutiny. Plaintiff alleges that First Oak, as Plaintiff's fiduciary, had an affirmative duty to speak and did not. He asserts, for example, "[a]t no point did [First Oak] disclose to [P]laintiff the securities bar that had been imposed on defendant Davis by the South Carolina Commissioner[,]" (Compl. ¶ 47), "[a]t no point did [First Oak] disclose to [P]laintiff that its agent, defendant Davis, was acting as an unregistered investment adviser representative with respect to [P]laintiff and [P]laintiff's [First Oak] account[,]" (Compl. ¶ 47), and "[a]t no point did [First Oak] disclose that it had an unregistered investment adviser on its staff[,]" (Compl. ¶ 48).

147. For these reasons, the Court GRANTS Abolins' Motion to the extent it pertains to affirmative misrepresentations but DENIES Abolins' Motion with respect to fraudulent concealment. First Oak's Motion with respect to Plaintiff's Second Cause of Action is DENIED.

D. North Carolina Investment Advisers Act Claim

148. Plaintiff alleges that Defendants are liable to him for violations of the North Carolina Investment Advisers Act (the "NCIAA"). The Court first addresses whether the statute of limitations bars Plaintiff's claim.

149. The NCIAA's applicable statute of limitations provision states:

> No person may sue . . . more than three years after the person discovers facts constituting the violation, but in any case no later than five years after the rendering of investment advice, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation . . . the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.

N.C.G.S. § 78C-38(d).

150. Here, allegations of wrongful conduct date back to 2009. The action was commenced on 1 October 2021, well over five years later. However, evaluating the Complaint in the light most favorable to Plaintiff, fraudulent concealment is alleged, and the facts are not sufficiently developed at this stage to determine when Plaintiff discovered, or reasonably should have discovered, the allegedly fraudulent conduct. Therefore, the claim survives Defendants' Motions on statute of limitations grounds. *See Aldridge*, 2019 NCBC LEXIS 116, at \*53–55 (applying the discovery rule to alleged NCIAA violation).

151. The NCIAA "creates a private cause of action against persons who commit primary violations of the NICAA and for persons who are liable as control persons." *Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *50 (N.C. Super. Ct. January 8, 2018) (citing N.C.G.S. § 78C-38). Thus, liability under the NCIAA can be primary or secondary. N.C.G.S. § 78C-38(a)–(b).

152. Pursuant to the NCIAA:

> It is unlawful for any person[9] who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, (1) [t]o employ any device, scheme, or artifice to defraud the other person, or (2) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon the other person[.]

N.C.G.S. § 78C-8(a)(1)–(2).

153. Primary liability under the Act exists when any person,

> (1) [e]ngages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or

> (2) [r]eceives, directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person, in violation of G.S. 78C-8(a)(1) or (2)[.]

N.C.G.S. § 78C-38(a)(1)–(2).

---

[9] "Person" means an individual, a corporation, a partnership, an association, a joint-stock company, a trust where the interests of the beneficiaries are evidenced by a security, an unincorporated organization, a government, or a political subdivision of a government. N.C.G.S. § 78C-2(5).

154.     Secondary liability exists for:

> (1) Every person who directly or indirectly controls a person liable under subsection (a) of this section, including every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the conduct giving rise to the liability is liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

> (2) Unless liable under subdivision (1) of this subsection, every employee or associate of a persona liable under subsection (a) of this section who materially aids in the conduct giving rise to the liability and every other person who materially aids in the conduct giving rise to the liability is liable jointly and several with and to the same extent as the person if the employee or associate or other person actually knew of the existence of the facts by reason of which the liability is alleged to exist.

N.C.G.S. §78C-38(b)(1)–(2).

155.     Plaintiff makes multiple allegations of fraudulent conduct on the part of each Defendant. He makes the overarching allegation that Defendants "engaged in and employed devices, schemes, and artifices to defraud. . . [P]laintiff[,]" (Compl. ¶ 260), concealed their "violations of the North Carolina Investment Advisers Act," and "fraudulently induced [P]laintiff to think things were 'business as usual' in order to avoid and forestall the commencement of this action[,]" (Compl. ¶ 261).

156.     Because this claim sounds in fraud, it must also meet Rule 9 pleading requirements for specificity. *Shareff*, 2013 NCBC LEXIS 14, at *12–13 (holding that claim for violation of N.C.G.S. § 78C-8(a)(1) is subject to Rule 9); *accord Aldridge*, 2019 NCBC LEXIS 116, at *126. For the reasons stated above, the Court has found

that Plaintiff's claim for fraud survives, at least in part, both Defendants' Motions. Plaintiff's claim for violation of the NCIAA survives as well. Accordingly, the Court DENIES Abolins' and First Oak's Motions with respect to Plaintiff's Third Cause of Action.

D.    <u>Negligent Misrepresentation Claim Against Abolins and First Oak</u>

157. First, the Court addresses whether the statute of limitations bars Plaintiff's negligent misrepresentation claim against Defendants. The statute of limitations for negligent misrepresentation is three years. N.C.G.S. § 1-52(5); *Guyton v. FM Lending Servs.*, 199 N.C. App. 30, 35 (2009). However, "[a] claim for negligent misrepresentation does not accrue until two events occur: first, the claimant suffers harm because of the misrepresentation, and second, the claimant discovers the misrepresentation." *Trantham v. Michael L. Martin, Inc.,* 228 N.C. App. 118, 119 (2013). Thus, as addressed above, whether the statute of limitations bars some or all of this claim remains to be determined on a more developed record.

158. "It has long been held in North Carolina that 'the tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care.'" *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532 (2000) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988)). However, "[e]ven if a misrepresentation is made, plaintiff will only be able to recover if his reliance was justified." *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC LEXIS 13, at *59 (N.C. Super. Ct. Mar. 1, 2012). "When

the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* at \*48–49 (quoting *Oberlin Cap., L.P.*, at 59). "Under North Carolina law, omissions do not serve as a basis for a negligent misrepresentation claim." *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at \*26 (N.C. Super. Ct. Sept. 28, 2018) (citations omitted). Finally, "[w]hen alleging negligent misrepresentation, a plaintiff must satisfy the heightened pleading standard for fraud found in Rule 9." *Oliver v. Brown & Morrison, Ltd.*, 2022 NCBC LEXIS 20, at \*23 (N.C. Super. Ct. Mar. 3, 2022) (citations omitted).

159.    Here, Plaintiff alleges that Abolins and First Oak had a duty to exercise reasonable care in communicating information to Plaintiff about his investments given their status as registered investment advisers and because he was relying on their "superior knowledge" about his investment planning. (Compl. ¶¶ 268–69.)

160.    As for reasonable reliance, Plaintiff pleads that, as registered investment advisers given discretionary authority, Abolins and First Oak were "in a position of superior knowledge, and their negligent conduct was not evident to "[P]laintiff" . . . [he] was not on equal footing with them, and he did not have any reason to question the veracity of their advice and conduct." (Compl. ¶ 269.)  He further alleges he "had no reason to suspect that [D]efendants had engaged in and implemented a negligent and unsuitable investment strategy on his behalf."  (Compl. ¶270.)  Even had he been alerted, "given the nature of [D]efendants' negligence, it

would have been difficult for [P]laintiff to have discerned what they had done wrong, why it was wrong, and why their conduct was below the standard of care." (Compl. ¶270.) The Court determines that under the circumstances presented here, these allegations satisfy the pleading requirements for reasonable reliance. *Cf. Martin Communs., LLC v. Flowers,* 2021 NCBC LEXIS 30, at \*14–15 (N.C. Super. Ct. Mar. 31, 2021) (dismissing claim for insufficient allegations that Plaintiff made reasonable inquiry into Defendants' representations, was denied the opportunity to investigate, or that it could not have learned the true facts by exercise of reasonable diligence).

161. However, as with Plaintiff's claim for fraud by affirmative misrepresentation, the Court concludes that Plaintiff has not pled with sufficient particularity a claim against Abolins. Accordingly, Abolins' Motion with respect to this claim is GRANTED. With respect to First Oak, however, to the extent the Complaint alleges that First Oak is vicariously liable for negligent misrepresentations made by Davis, the Motion is DENIED.

E.      N.C. RICO Claim Against Abolins and First Oak

162. The North Carolina Racketeer Influenced and Corrupt Organizations Act (the "N.C. RICO Act") "prohibits persons from engaging in a pattern of racketeering activity or conducting or participating in an enterprise through a pattern of racketeering activity." *Avadim Health, Inc. v. Harkey*, 2021 NCBC LEXIS 104, at \*28 (N.C. Super. Ct. Nov. 30, 2021) (citing N.C.G.S. § 75D-4(a)).

163. North Carolina law defines "racketeering activity" as a "means to commit . . . an act or acts which would be chargeable by indictment if such act or acts

were accompanied by the necessary mens rea" under Chapter 14 of the General Statutes of North Carolina. N.C.G.S. § 75D-3(c)(1). A "pattern of racketeering activity" is defined to require "engaging in at least two incidents of racketeering activity that have the same or similar purposes, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics" within a four-year period of time. N.C.G.S. § 75D-3(b). Section 75D-3(c)(1) enumerates specific North Carolina statutory provisions, the violation of which will serve as a predicate action to support a N.C. RICO Act claim. " 'Racketeering activity' also includes the description in Title 18, United States Code, Section 1961(1)." N.C.G.S. § 75D-3(c)(2).

164. "To state a claim under the [N.C.] RICO Act, (1) an 'innocent person' must allege (2) an injury or damage to his business or property (3) by reason of two or more acts of organized unlawful activity or conduct, (4) one of which is something other than mail fraud, wire fraud, or fraud in the sale of securities, (5) that resulted in pecuniary gain to the defendant[s]." *Gilmore v. Gilmore*, 229 N.C. App. 347, 356 (2013) (quoting *In re Bostic Constr., Inc.*, 435 B.R. 46, 68 (Bankr. M.D.N.C. 2010) (quotation marks omitted).

165. First Oak argues that the misconduct alleged is not the sort of activity that the General Assembly intended to constitute a violation of the N.C. RICO Act claim. (Def. First Oak's Mem. Supp. Mot. Dismiss 16–17.) The Court agrees. As observed by the Court of Appeals in *Gilmore*, the alleged wrongful conduct must involve something other than "fraud in the sale of securities." The *Gilmore* court

further held that "the General Assembly did not intend that an investor's claim to recoup money lost through a failed financial venture with no larger criminal scope could be the basis of a RICO claim, and . . . that conduct is not within the scope of the N.C. RICO Act." *Avadim Health, Inc.*, 2021 NCBC LEXIS 104, at *31 (citing *Campbell v. Bowman*, No. COA05-16, 2005 N.C. App. LEXIS 2444, at *15 (N.C. Ct. App. Nov. 15, 2005). Instead, the N.C. RICO Act is intended to reach allegations of "organized crime." *Id.* at *30.

166. Plaintiff argues that this is not a situation where an investor has simply lost money through isolated and unrelated incidents of unlawful conduct, but rather it is one in which the Defendants "have been the subject of multiple securities fraud lawsuits, . . . hav[e] been disbarred from the securities industry after being the subject of multiple law enforcement investigations, . . . [and] fac[ed] government orders that found them to have engaged in dishonest and/or unlawful conduct[.]" (Pl.'s Br. Opp. Def. First Oak's Mot. Dismiss 24–25.) In the Complaint, Plaintiff alleges that Defendants' pattern of racketeering included:

> mail fraud, wire fraud, fraud in the sale of securities, engagement in continuing criminal enterprise pursuant to [N.C.G.S.] § 14-7.20, larceny pursuant to [N.C.G.S.] § 14-74, embezzlement by a fiduciary pursuant to [N.C.G.S.] § 14-90, obtaining property by false pretenses pursuant to [N.C.G.S.] § 14-100, obtaining signatures by false pretenses pursuant to [N.C.G.S.] § 14-101, . . . fraudulent and deceptive advertising pursuant to [N.C.G.S.] § 14-117 [and] violations of the North Carolina Investment Advisers Act . . . pursuant to [N.C.G.S.] § 78C-39.

(Compl. ¶ 278.)

167. But the plaintiffs in both *Avadim* and *Campbell* likewise asserted embezzlement, malfeasance of an officer, wire fraud, obtaining property by false

pretenses, and obtaining signatures by false pretenses.  *See Avadim*, 2021 NCBC LEXIS 104, at \*29; *Campbell*, 2005 N.C. App. LEXIS 2444, at \*12.  Nevertheless, because the underlying dispute was an investor's claim to recoup money lost through a failed financial venture, both this Court and the Court of Appeals held that the conduct simply did not amount to the type of activity the General Assembly intended to be the basis of an N.C. RICO Act claim.

168.    For these reasons, the Court GRANTS Abolins' and First Oak's Motions as to Plaintiff's Fifth Cause of Action, and this claim is dismissed with prejudice.[10]

F.    Civil Conspiracy Claim Against Abolins and First Oak

169.    "Civil conspiracy is not an independent cause of action in North Carolina.  Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct."  *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at \*18 (N.C. Super. Ct. Oct. 9, 2018) (citing *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002)).  Our Supreme Court has stated:

> Accurately speaking, there is no such thing as a civil action for conspiracy.  The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone.  The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof—the damage—not the conspiracy or the combination. The combination may be of no consequence except as bearing upon rules of evidence or the persons liable.

*Reid v. Holden*, 242 N.C. 408, 414–15 (1955) (quoting 11 Am. Jur., Conspiracy, § 45).

---

[10] Having granted both Defendants' Motions to Dismiss with respect to this claim, the Court declines to address the statute of limitations argument raised by First Oak.

170. "To state a claim for civil conspiracy, a plaintiff must allege '(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.' " *Glob. Textile All.*, 2018 NCBC LEXIS 104, at \*18–19 (quoting *Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011)). However, proof of a civil conspiracy "does no more than associate the defendants together . . . . The gravamen of the action is the resultant injury, and not the conspiracy itself." *Henry v. Deen*, 310 N.C. 75, 87 (1984) (citations omitted). Therefore, to state a claim, in addition to an agreement, there must be an allegation of a wrongful act that causes damage in furtherance of that agreement. *Fox v. Wilson,* 85 N.C. App. 292, 301 (1987); *see also Dickens v. Puryear*, 302 N.C. 437, 456 (1981).

171. Where a conspiracy is found to exist, the conspirators are held jointly and severally liable for any act done in furtherance of their unlawful agreement. *Fox,* 85 N.C. App. at 301.

172. Moreover, "the statute of limitations for a civil conspiracy claim is governed by the underlying claim that forms the basis of the civil conspiracy claim." *Lau v. Constable*, 2019 NCBC LEXIS 71, at \*24 (N.C. Super. Ct. Sept. 24, 2019) (citing *BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 304 (2019)).

173. Plaintiff alleges his claim for civil conspiracy in conjunction with his claim for constructive fraud. Specifically, he asserts that Davis and Abolins "conspired to defraud [P]laintiff by exploiting their respective positions of trust and

confidence to direct the assets of [P]laintiff under their management into investments intended to benefit and enrich" themselves. (Compl. ¶ 282.) The Court has determined that the constructive fraud claim survives Defendants' Motions. In addition, Plaintiff adequately alleges the existence of an agreement to act pursuant to a common scheme and resulting injury. (Compl. ¶ 24.) Therefore, Plaintiff has adequately alleged the requisite basis for his ancillary conspiracy claim. *See Morris Int'l, Inc. v. Packer*, 2021 NCBC LEXIS 16, at *40 (N.C. Super. Ct. Feb. 22, 2021) (plaintiff's claim for breach of fiduciary duty supports civil conspiracy theory).[11]

174. However, First Oak argues that Plaintiff's civil conspiracy claim fails as a matter of law to the extent Plaintiff alleges that it participated in a conspiracy that preexisted it. (Def. First Oak's Mem. Supp. Mot. Dismiss 7.) Plaintiff responds that Davis and Abolins conspired to defraud him all along, and that First Oak became responsible for the totality of their wrongful acts when it was formed in January 2017 to continue the conspiracy by which he was damaged. (Pl.'s Br. Opp. Def. First Oak's Mot. Dismiss 28–29.)

175. As for the allegations of constructive fraud resulting from acts or concealment committed by Abolins or by First Oak after it came into existence, the

---

[11] While there is no recognized standalone action for civil conspiracy in North Carolina, a claim for facilitating fraud "permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Nye v. Oates*, 96 N.C. App. 343, 346–47 (1989) (citation omitted). "The elements of facilitating fraud are: (1) that the defendants agreed to defraud plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53 (2002). Thus, a claim for civil conspiracy to commit fraud and a claim for facilitating fraud are essentially the same claim. *TaiDoc Tech v. Corp. v. OK Biotech Co.*, 2016 NCBC LEXIS 26, at *30 (N.C. Super. Ct. Mar. 28, 2016).

Court determines that Plaintiff has stated a claim that requires evaluation on a more developed record. "[I]t is difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *48 (N.C. Super. Ct. Apr. 23, 2015); *see also Glob. Textile All., Inc.*, 2018 NCBC LEXIS 104, at *33 (finding allegations minimally sufficient to support a civil conspiracy claim); *Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at *37 (N.C. Super. Ct. Apr 1, 2021) ("An action for conspiracy may be proven through circumstantial evidence, and behavior that may be benign or innocuous when standing alone can acquire a different meaning when placed in a larger context." (citation and quotation marks omitted)).

176. However, the Court agrees that no conspiracy claim can be stated against First Oak for acts that occurred before it joined the alleged conspiracy *if those acts completed the ultimate objective* of the conspiracy. In contrast, if the objective of the conspiracy was not yet achieved when First Oak joined, then First Oak remains jointly and severally liable for those acts. *See, e.g., In re Am. Cont'l Corp. v. Lincoln Savs. & Loan Sesc. Litig.*, 794 F. Supp. 1424, 1437 (D. Ariz. 1992) ("The distinction turns on whether the goal of the common design has been achieved with finality . . . or is ongoing in nature[.]"); *S. Union Co. v. Southwest Gas Corp.*, CV-99-1294-PHX-ROS, 2001 U.S. Dist. LEXIS 24759, at *21–22 (D. Ariz. Mar. 21, 2001). The facts with respect to this determination remain to be developed.

177. For these reasons, the Court DENIES Abolins' and First Oak's Motions as to Plaintiff's Civil Conspiracy Claim.

### III. CONCLUSION

1.    For these reasons, the Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED in part** as follows:

    a. Both Defendants' Motions with respect to Plaintiff's "Fourth"[12] Cause of Action (North Carolina Racketeering Influenced and Corrupt Organizations Act (RICO)) are **GRANTED**, and this claim is dismissed with prejudice;

    b. Abolins' Motion to Dismiss is **GRANTED** as to Plaintiff's claim for affirmative fraud and for negligent misrepresentation, and these claims are dismissed without prejudice[13];

    c. In all other respects, the Motions are **DENIED**.

IT IS SO ORDERED, this the 28th day of July, 2022.


/s/ Julianna Theall Earp
_____

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

[12] The Court references the claim as it is (mis)numbered in the Complaint.

[13] The decision to dismiss an action with or without prejudice is in the discretion of the trial court.  *See First Fed Bank v. Aldridge*, 230 N. C. App. 187, 191 (2013)